# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>The trailer to be searched within the Central District of California is a Forest River Wildwood trailer, depicted below at SUBJECT PREMISES, presumed to be parked at 2750 W. Acacia Ave., SP H21, Hemet, California 92545 further described in Attachment A-2. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 2:23-MJ-4160 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A (a)(2) | Receipt and distribution of child pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of child pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel S. Diaz, TFO FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Hon. Pedro V. Castillo, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: KButler x16495

## ATTACHMENT A-2

**TRAILER TO BE SEARCHED**

The trailer to be searched within the Central District of California is a Forest River Wildwood trailer, depicted below at SUBJECT PREMISES, presumed to be parked at 2750 W. Acacia Ave., SP H21, Hemet, California 92545.  According to SUBJECT PERSON's DMV information, a 2016 "FORR", California license plate 1MJ3470, VIN 4X4TWDD27GE030571.  I believe the Forest River Wildwood trailer is likely the "FORR" registered to SUBJECT PERSON.



## ATTACHMENT B

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography) namely:

a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, of child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, including but not limited to financial records, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment,

order, request, trade, purchase, or transaction of any kind
involving the transmission through interstate commerce by any
means, including by computer, of any visual depiction of a minor
engaged in sexually explicit conduct, as defined in 18 U.S.C.
§ 2256.

   e. Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
identifying persons transmitting in interstate commerce,
including by computer, any visual depiction of a minor engaged
in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

   f. Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that identify any minor visually depicted while engaging in
sexually explicit conduct, as defined in 18 U.S.C. § 2256.

   g. Any and all records, documents, programs,
applications, or materials or items which are sexually arousing
to individuals who are interested in minors, but which are not
in and of themselves obscene or which do not necessarily depict
minors involved in sexually explicit conduct.  Such material is
commonly known as "child erotica" and includes written materials
dealing with child development, sex education, child
pornography, sexual abuse of children, incest, child
prostitution, missing children, investigative techniques of
child exploitation, sexual disorders, pedophilia, nudist
publications, diaries, and fantasy writings.

h.    Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

i.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file-sharing software.

j.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

k.    Any records, documents, programs, applications, materials, and files relating to IP addresses 104.32.138.237.

l.    Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

m.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

n.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet Protocol addresses used by the device.

2.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

1. In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search
warrant will employ the following procedure:

a. Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location. The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant. The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable,

x

return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

xi

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Richard Joseph Winchester's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Richard Joseph Winchester's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Daniel S. Diaz, being duly sworn, declare and states as follows:

## I.  **INTRODUCTION**

1.   I am a sworn Police Officer with the Inglewood Police Department and have been so employed since June of 2000. Additionally, I have been assigned as a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") since May 2021.I am currently assigned to the FBI Los Angeles' Human Trafficking ("HT") and Violent Crimes Against Children ("VCAC") squad, where I serve as a TFO and have been so appointed since May 2021.  During my time as a TFO with the FBI, I have conducted interviews, surveillance, executed residential search warrants, read and authored FBI reports, and managed leads and tips submitted to FBI Los Angeles.  I have participated in several investigations related to HT and VCAC, including but not limited to violations of Title 18 U.S.C. § 1591, Sex Trafficking of a Minor or by Force, Fraud, or Coercion; Title 18 U.S.C. § 1594(c), Conspiracy to Commit Sex Trafficking of a Minor or by Force, Fraud, or Coercion; Title 18 U.S.C. § 2251, Sexual Exploitation of a Minor; Title 18 U.S.C. § 2422, Coercion and Enticement of a Minor for Illegal Sexual Activity; Title 18 U.S.C. § 2252, Possession of Child Pornography; Title 18 U.S.C. § 1470, Transfer of Obscene Matter to a Minor, and Title 18 U.S.C. § 2252A(a)(2), Receipt and Distribution of Child Pornography.

2.    In my capacity as an Inglewood Police Officer, I have
worked Patrol, the Anti-Crime-Team and selected as a Field
Training Officer.  During my duties in the above listed
assignments, I have conducted numerous HT-related detentions,
investigations and arrests as well as worked in an undercover
capacity engaging in HT operations.  Additionally, I assisted in
multiple investigations related to the sexual exploitation of
children.

3.    As both an FBI TFO and Inglewood Police Officer, I
have received informal and formal training regarding HT, read
literature pertaining to the subculture of HT and consulted with
numerous experts on the topic.  Through my training,
conversations with other law enforcement personnel, and field
experience, I have become familiar with the methods of operation
used by human traffickers and how people use electronic devices
and the Internet to commit such crimes.

4.    Through my training and experience, I have become
familiar with how individuals use electronic devices and
communication applications to commit crimes related to the
sexual exploitation of children.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.    This affidavit is made in support of applications for
warrants to search the premises located at 2750 W. Acacia
Avenue, SP H21, Hemet, California 92545 (the "SUBJECT
PREMISES"), as further described in Attachment A-1; the Forest
River Wildwood trailer observed at SUBJECT PREMISES, as further
described in Attachment A-2; the person of Richard Joseph

Winchester (the "SUBJECT PERSON"), as further described in Attachment A-3; and the Chevrolet SVU (California license plate 8ZXH299), (the "SUBJECT VEHICLE") registered to SUBJECT PERSON, as further described in Attachment A-4; and the for violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography).

6.    As described further in Attachment B, the requested warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses").  Attachments A-1, A-2, A-3, A-4 and B are attached hereto and incorporated herein by reference.

III. **The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  SUMMARY OF PROBABLE CAUSE**

7.    An online covert employee ("OCE") in FBI Albany/ Syracuse, observed Kik user offroadjoe distribute Child Sexual Abuse Material ("CSAM") within a group on Kik in 2022.  The video of CSAM was distributed between approximately January 31 and March 3, 2022 and was captured by the OCE.

8.    FBI Albany then issued a subpoena to Kik.  The response showed that offroadjoe was associated with IP address

104.32.138.237 approximately 260 times between approximately
February 18 and March 12, 2022 and email address
mohawkjoe1972@gmail.com.  FBI Albany sent a subpoena to Spectrum
(Charter Communications).  The response showed that Marek
Madrid, located at an address in Los Angeles, California, was
the subscriber associated with the IP address.

9.    FBI Albany referred the case to FBI Los Angeles, and,
on August 26, 2022, FBI Los Angeles determined that Kik username
offroadjoe and the IP address are listed in two CyberTipline
Reports from the NCMEC.  One report indicated the distribution
of CSAM by Kik username offroadjoe.

10.    FBI Los Angeles issued a subpoena to Google LLC.  The
response showed that mohawkjoe1972@gmail.com is associated with
Richard J. Winchester, whom is the SUBJECT PERSON; 2750 West
Acacia Ave., H21, Hemet, California 92545, which is SUBJECT
PREMISES; and phone number 951-454-5117 which according to a
public records database is associated to SUBJECT PERSON.

11.    As part of this investigation, I reviewed the SUBJECT
PERSON's California Department of Motor Vehicle ("DMV") photo.
On or about July 31, 2023, I re-reviewed the information
provided to FBI Albany, which included the Kik chat where
offroadjoe distributed CSAM.  The Kik profile photo associated
with offroadjoe appears to be a photo of the SUBJECT PERSON.

12.    Additionally, the SUBJECT PREMISES is listed as the
SUBJECT PERSON's address on his DMV record.[1]

---

[1] When reviewing the DMV, I noticed a spelling error in the
SUBJECT PREMISES.  The street name is spelled Acaia Avenue and I
believe it should be Acacia.

13.  On July 18, 2023, an FBI Task Force Officer ("TFO") surveilled the SUBJECT PERMISES.  The TFO observed the Forest River Wildwood trailer on the SUBJECT PREMISES, and the Chevrolet SVU (California license plate 8ZXH299) registered to the SUBJECT PERSON, parked next to the trailer.  Based upon the information above, I believe that SUBJECT PERSON lives at the SUBJECT PREMISES.

14.  Accordingly, based on my training and experience, as well as my familiarity with this investigation, I believe that probable cause exists that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES; in the Forest River Wildwood trailer observed at SUBJECT PREMISES; on SUBJECT PERSON; and in the SUBJECT VEHICLE, registered to SUBJECT PERSON.

15.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    Background of Investigation

16.  According to an FBI Albany report, on January 28, 2022, FBI Albany, Syracuse Resident Agency, arrested an individual for violations of 18 USC 2252A, Distribution of Child Pornography.  On the day of his arrest, the arrestee consented for the FBI to assume his Kik online identity, conrad12349.

17.  According to FBI Albany, from approximately January 31 to March 3, 2022, the OCE -- who was a member of the FBI Child Exploitation and Human Trafficking Task Force ("CEHTTF") in FBI

Albany, Syracuse Resident Agency -- was connected to the internet in an online undercover capacity from an Internet capable device located in Syracuse, New York.  A software program was utilized to record the online activity, chats, and images identified within KiK.

18.  Acting as user conrad12349, the OCE navigated to Kik group, "child play house."  The OCE noted that the trading of child pornography was the primary purpose of the group and its members.  While in the group, the OCE captured Kik user offroadjoe distribute one child pornography video within the group.  According to FBI Albany, at the time of the OCE activity, offroadjoe was on Kik for 2,442 days.

**B.    Identification of the SUBJECT PERSON and the SUBJECT PREMISES**

19.  On or about February 24, 2022, FBI Albany served a subpoena to Kik regarding several usernames to include offroadjoe.  The response from Kik, dated March 18, 2022, provided information to include the following associated with offroadjoe:

- First Name: Brother

- Last Name: Bear

- Email Address: mohawkjoe1972@gmail.com (unconfirmed)

- Username: offroadjoe

- IP Addresses (to include, but not limited to): 104.32.138.237. This IP address was identified on the subpoena returns on approximately 260 occasions between approximately February 18 and March 12, 2022.

6

20.  On or about March 23, 2022, FBI Albany served a
subpoena to Spectrum (Charter Communications).  The response
from Charter Communications, dated April 18, 2022, provided
information, to include the following, regarding IP address
104.32.138.237:

- Subscriber Name: Marek Madrid

- Service Address: 4316 S. Normandie Ave., Los Angeles,
California 90037

- Billing Address: 4316 S. Normandie Ave., Los Angeles,
California 900037

- E-mail Addresses: cumdaddy@charter.net and
marekmadrid@yhaoo.com

- Phone Number: 626-629-0020

- Length of service: October 14, 2020 (active)

21.  Based upon the location of the IP address, FBI Albany
sent a lead to FBI Los Angeles and the lead was assigned to
Special Agent Julie Miller.  On or about August 25, 2022,
Special Agent Miller opened an investigation for the
distribution of child pornography.

22.  On June 8, 2023, FBI Los Angeles served a subpoena to
Google for email address mohawkjoe1972@gmail.com.  The response
from Google, also dated June 8, 2023, provided information to
include the following:

- Name: Mohawk Joe

- Billing Name: Richard J. Winchester

- Billing Address: 2750 West Acacia Ave., H 21, Hemet,
California 92545

- Phone Number: 951-454-5117

23.   As part of the investigation, I reviewed Richard J.
Winchester's California DMV photo.  On or about July 31, 2023, I
re-reviewed the information provided to FBI Albany, which
included the Kik chat where offroadjoe distributed CSAM.  The
Kik profile photo associated with offroadjoe appears to be a
photo of Richard J. Winchester.

24.   On or about June 20, 2023, FBI Los Angeles ran a
National Crime Information Center ("NCIC") check for Richard J.
Winchester.  According to DMV information, Richard J.
Winchester's middle name is Joseph.  The name Joe is an
abbreviated name for Joseph, which is part of Kik username
offroadjoe and email address mohawkjoe1972@gmail.com.  In
addition, Richard J. Winchester was born in 1972, which is part
of the email address.  According to his California DMV record,
Richard J. Winchester is associated with 2750 W. Acaia Ave., SP
H21, Hemet, California 92545.  I believe Acaia is spelled
incorrectly on his driver's license and should be Acacia.

25.   Based upon the Google LLC subpoena return, the Kik
profile picture and name, and the similarities in Richard J.
Winchester's email address to his name and date of birth, I
believe that Richard J. Winchester is SUBJECT PERSON and the
user of offroadjoe.

26.   I believe that Marek Madrid and SUBJECT PERSON know
each other, which makes it possible that SUBJECT PERSON may have
used his Kik account offroadjoe to distribute CSAM while at

Marek Madrid's home.  The following are examples of why I
believe they know each other:

        a.   I reviewed an Accurint report from June 2022,
which identified a possible familial connection between Marek
Madrid and an individual by the name of Somaya Sanchez.  I
reviewed a screenshot from June 2023 of Somaya Sanchez's
Facebook account.  The Facebook profile picture includes, who I
believe to be, Somaya Sanchez and SUBJECT PERSON.  Her profile
indicates she is married and also goes by Somaya Winchester,
SUBJECT PERSON's last name.  I also observed in the background
profile picture of her Facebook account was a picture of who I
believe to be her and two minor sons.

        b.   On or about July 31, 2023, I reviewed Hemet
Police Department report 2023-02759 regarding possible child
abuse.  In or around May 4, 2023 the school nurse at Whittier
Elementary School, located in the city of Hemet, reported the
abuse to Child Protective Service.  According to the report,
minor child D. Sanchez had a small cut on his left eyebrow area.
When D. Sanchez was asked who hurt him, he replied, "dad did
it."  D. Sanchez advised that he grabbed his 11-year-old
brother, M. Madrid's, eye glasses and threw them.  D. Sanchez
stated that SUBJECT PERSON got mad and slammed his head on the
table.  When M. Madrid was interviewed, he referred to SUBJECT
PERSON as his step-father.  M. Madrid advised that SUBJECT
PERSON only spanked D. Sanchez's buttock, over his clothing.
The police report indicates that SUBJECT PERSON, Somaya Sanchez,
D. Sanchez (minor child), and M. Madrid (minor child) reside at

Casa Del Sol RV Park located at 2750 W. Acacia Ave., H21, Hemet, California 92545, which is SUBJECT PREMISES.

    c.   On June 26, 2023, FBI Special Agent Ronald G. Schloegel and I, TFO Diaz, spoke with Madrid Marek under a pretext of a hit and run investigation.  While speaking with Madrid Marek, he disclosed that he has an 11-year-old son that lives in Hemet.

    d.   According to Marek Madrid's Accurint report from June 2022, I identified that he has or had a security guard license.  According to SUBJECT PERSON's Accurint report, SUBJECT PERSON has or had a security guard license as well.  I believe this could mean the two could have worked together.

    27.  On July 18, 2023, Joel Pabelico, Senior Investigator II with the Riverside County District Attorney's Office surveilled the SUBJECT PREMISES.  According to the information relayed to me, as well as photos and a video taken, Joel Pabelico observed the Forest River Wildwood trailer on the SUBJECT PREMISES, and the Chevrolet SVU (California license plate 8ZXH299) registered to SUBJECT PERSON, parked next to the trailer.  Based upon all of the information above, I believe that SUBJECT PERSON lives at the SUBJECT PREMISES.

    **C. FBI Los Angeles' Review of the CSAM Distributed by Kik User Offroadjoe**

    28.  On June 5, 2023, Special Agent Julie Miller reviewed the CSAM video distributed by offroadjoe to Kik group, "child play house".  Special Agent Miller relayed to me that the video is described as follows:

a.   A minor female, naked, but possibly wearing what appears to be high socks, lying on her back digitally stimulating and exposing her vagina towards a camera.  The filename was IMG_0126.MP4 and was approximately one minute and six seconds in length.

29.  On August 26, 2022, FBI Los Angeles queried the aforementioned IP address 104.32.138.237 and username offroadjoe, in the Internet Crimes Against Children ("ICAC") database for de-confliction and the Internet Crimes Against Children, Child On-line Protection System ("ICACCOPS") database for potential download of CSAM through the darknet.

30.  The Kik username offroadjoe was identified in NCMEC CyberTipline report 121474489 and the IP address 104.32.138.237 was identified in a NCMEC CyberTipline report 36404122.

31.  On July 31, 2023, I reviewed CyberTipline report 121474489 and identified the following:

- Incident Type: Child pornography (possession, manufacture, and distribution)

- Incident Time: April 3, 2022 05:53:56 UTC

- Chat Service/IM Client: Kik Messenger

- Email Address: mohwakjoe1972@gmail.com

- Screen/User Name: offroadjoe

32.  According to the CyberTipline report, on or about March 10, 2022, a video was uploaded through Kik by username offroadjoe, as previously stated, resolves to SUBJECT PERSON. According to the report, Kik, the Reporting Electronic Service Provider (ESP) viewed the entire contents of the uploaded file.

33.  On June 5, 2023, Special Agent Julie Miller reviewed the aforementioned video and relayed to me it is approximately 50 seconds in length and described as follows:

a.  For approximately 12 seconds, a minor female is holding and orally copulating a dildo-like object that resembles an adult penis.  For the remainder of the video, the minor female, with her vagina exposed toward the camera, stimulated her vagina with the dildo-like object.  The filename was 949ff70C-ee14-42f0-a03f-d5b95812ba8c.mp4.

34.  On July 31, 2023, I reviewed CyberTipline report 36401422 and identified the following:

35.  According to the NCMEC report, Facebook advised that a user was involved with child pornography.  The NCMEC report also contained additional information about the recipient of the reported content.  This portion of the report contained, but not limited to, the following: numerous recipients names, email addresses, ages or date of births, screen names, and IP addresses.  This portion included IP address 104.32.138.237 and the following information:

- First Name: Angel

- Last Name: del la Paz

- Age: 30

- DOB: February 6, 1988

- Profile URL: http://www.facebook.com/people/Angel-Angel-de-la-Paz/100013325583711

36.  In sum, there is probable cause to believe that the individual using the Kik username offroadjoe is the SUBJECT

PERSON, and that SUBJECT PERSON is distributing CSAM, and
resides at the SUBJECT PREMISES.

37.  Accordingly, based on the investigation as well as my
training and experience, there is probable cause to believe that
evidence of the SUBJECT OFFENSES will be found at the SUBJECT
PREMISES; in the Forest River Wildwood trailer observed at
SUBJECT PREMISES; on SUBJECT PERSON; and in the Chevrolet SVU
(California license plate 8ZXH299) registered to SUBJECT PERSON.
Moreover, as described in more detail in the following section,
individuals involved in the SUBJECT OFFENSES tend to keep images
and/or videos of child pornography for long periods of time.
Indeed, here, the investigation so far shows that the SUBJECT
PERSON was likely involved in multiple child exploitation
offenses in early 2022 with the OCE observing uploads to the Kik
chat group, and the CyberTipline report regarding uploads of
child pornography, as detailed above.  Based on my training and
experience, this shows the SUBJECT PERSON's continued sexual
interest in children.

38.  Individuals, such as the SUBJECT PERSON, are likely to
possess these videos and images within their residence, on
digital devices stored within their residence and in vehicles
they operate, and on digital devices kept on their person.
Keeping and maintaining these images and/or videos in their
residence and on their person allows for quick and immediate
access to the images and/or videos.

## V.  TRAINING & EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

39.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

b.   Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share

the same interests in child pornography.  These individuals often maintain possession of these items for long periods of time.

40.   Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

VI. **Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on the SUBJECT PERSON.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT PREMISES could lead to evidence of child exploitation offenses.BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS**

41.   In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

42. Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a. <u>Computers and Child Pornography</u>. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b. <u>File Storage</u>. Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can

be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

        c.    <u>Internet</u>.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

        d.    <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on

their customer's behalf; and may provide other services unique
to each particular ISP.  ISPs maintain records pertaining to the
individuals or businesses that have subscriber accounts with
them.  Those records often include identifying and billing
information, account access information in the form of log
files, e-mail transaction information, posting information,
account application information, and other information both in
computer data and written record format.

       e.   IP Addresses.  An Internet Protocol address ("IP
Address") is a unique numeric address used to connect to the
Internet.  An IPv4 IP Address is a series of four numbers, each
in the range 0-255, separated by periods (e.g., 121.56.97.178).
In simple terms, one computer in a home may connect directly to
the Internet with an IP Address assigned by an ISP.  What is now
more typical is that one home may connect to the Internet using
multiple digital devices simultaneously, including laptops,
tablets, smart phones, smart televisions, and gaming systems, by
way of example.  Because the home subscriber typically only has
one Internet connection and is only assigned one IP Address at a
time by their ISP, multiple devices in a home are connected to
the Internet via a router or hub.  Internet activity from every
device attached to the router or hub is utilizing the same
external IP Address assigned by the ISP.  The router or hub
"routes" Internet traffic so that it reaches the proper device.
Most ISPs control a range of IP Addresses.  The IP Address for a
user may be relatively static, meaning it is assigned to the
same subscriber for long periods of time, or dynamic, meaning

that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

      f.   The following definitions:

      i.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

      ii.   "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

      iii. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has

been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

        iv.   "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

        v.   "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

        g.   "CyberTipline".  The National Center for Missing and Exploited Children ("NCMEC") is a nonprofit organization in

the United States working with law enforcement on issues relating to missing and exploited children.  NCMEC provides information it receives from the public and Electronic Service Providers ("ESPs") to law enforcement agencies.  ESPs are companies such as Google, Yahoo!, and AOL, which provide free and paid services online.  These services may include e-mail, instant messaging, and online storage.  NCMEC sends information to law enforcement by way of CyberTipline reports.  According to NCMEC's website, the CyberTipline is operated in partnership with the FBI, ICE, U.S. Postal Inspection Service, U.S. Secret Service, military criminal investigative organizations, U.S. Department of Justice, Internet Crimes Against Children Task Force program, as well as other state and local law enforcement agencies. Reports to the CyberTipline are made by the public and ESPs. ESPs are required by law to report apparent child pornography to law enforcement via the CyberTipline.

i.   The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

ii.   An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic

sent from and directed to that computer or device may be
directed properly from its source to its destination. Most
Internet Service Providers ("ISPs") control a range of IP
addresses. IP addresses can be "dynamic," meaning that the ISP
assigns a different unique number to a computer or device every
time it accesses the Internet. IP addresses might also be
"static," if an ISP assigns a user's computer a particular IP
address that is used each time the computer accesses the
Internet. ISPs typically maintain logs of the subscribers to
whom IP addresses are assigned on particular dates and times.

       iii. "Minor," as defined in 18 U.S.C. § 2256(1),
refers to any person under the age of eighteen years.

       iv. "Mobile applications," as used herein, are
small, specialized programs downloaded onto mobile devices that
enable users to perform a variety of functions, including
engaging in online chat, reading a book, or playing a game.

       v. "Records," "documents," and "materials," as
used herein, include all information recorded in any form,
visual or aural, and by any means, whether in handmade,
photographic, mechanical, electrical, electronic, or magnetic
form.

       vi. "Sexually explicit conduct," as defined in
18 U.S.C. § 2256(2), means actual or simulated (a) sexual
intercourse, including genital-genital, oral-genital, anal-
genital, or oral-anal, whether between persons of the same or
opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or

masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

vii. A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

viii.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## VII. **TRAINING & EXPERIENCE ON KIK**

43.  Kik Messenger, also known as "Kik," is a popular free instant messenger application for mobile devices (i.e., smart phones, tablets, iPods, etc.) from the Canadian-based Kik Interactive, Inc., which was founded in 2009.  According to Kik Interactive, Kik Messenger has approximately 300 million registered users, and is used by approximately 40 percent of United States teenagers.  Kik is available on several mobile device platforms, including iOS, Android, and Windows Phone operating systems.  The Kik application utilizes the Internet connection through the mobile devices' cellular data plan or through Wi-Fi to send and receive messages, photos, videos,

sketches, mobile webpages, and other content transmitted by
users through the Kik application.

44.  Kik allows its users to register a user account
without providing a telephone number and prevents users from
being located on the service through any information other than
their chosen, unique Kik username.  At the completion of the
account registration, the user is allowed to start communicating
with other Kik users.  Searching for specific Kik users can only
be performed using a Kik user's registered username; searches by
phone number or email address cannot be performed.  Entering the
unique Kik username through the application's search field
yields potential matches with which the user can select to start
communicating.

45.  Kik usernames are unique in that more than one user
cannot have the same username and once a username is registered
to a particular user, the alphanumeric combination comprising
the username cannot be used by any other person.  Searching for
the unique username is the only way to find a specific user.
Each Kik user, when signed into their username, can choose a
display name.  The display name does not need to match the
username, but it can if the user so chooses.  When users choose
the display name tied to their username, the display name can be
the same as other display names.  While a username is used for
finding a user, once users connect, the display name for each
user is what is shown in the chats between and among users.
Based on my training and experience, I know that chat
applications are often used to communicate with others,

including during the commission of crimes.  In particular, I know that Kik has become a chat application popular with individuals who have a sexual interest in children and images of children to discuss their interest with other like-minded individuals, including to share images and videos of child pornography

### VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

46.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

       c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    47.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

48.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Richard Joseph Winchester's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Richard Joseph Winchester's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

49.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>REQUEST FOR SEALING</u>

50.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant affidavit.  I believe that

sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving minor victims and as far as I am aware, the targets of this investigation remain unaware that they are being investigated. Disclosure of the search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Further, based upon my training and experience, I have learned that online criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## X.  CONCLUSION

51.  For all the reasons described above, there is probable cause to believe to believe that evidence, fruits, and instrumentalities of violations 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography) as described in Attachment B will be found in a search of the SUBJECT PREMISES and the SUBJECT PERSON.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2022.


_____
UNITED STATES MAGISTRATE JUDGE